The following constitutes
the order of the court. Signed June 5, 2013

_____
M. Elaine Hammond
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                                             Case No. 11-71474 MEH

MARK ANTHONY FEILING                              Chapter 13

_____Debtor/

**DECISION AFTER TRIAL**

Mark Feiling ("Debtor") filed a chapter 13 bankruptcy petition on October 28, 2011 and sought confirmation of a plan. Debtor's former spouse, Patricia Feiling ("Patricia"), objected to the plan on the basis that it was not proposed in good faith. Patricia is the holder of the largest unsecured claim in the case: (1) a priority unsecured claim for child support arrears ("Child Support Claim") and (2) a partially secured claim arising from the judgment for property settlement in the Feilings' state court dissolution proceedings (the "Claim"). During the case, the Child Support Claim was reduced to approximately $5,400 by application of tax refunds to the arrears. Patricia's property settlement Claim was allowed in the amount of $118,170, and is partially secured by funds held in an attorney trust account. The remainder of the Claim is unsecured but would be exempt from discharge in a Chapter 7 case. Debtor's chapter 13 plan was amended numerous times. On April 10 and 12, 2013, the court held an evidentiary hearing to determine whether Debtor's Seventh Amended Chapter 13 Plan (Dkt. No. 88) (the "Plan") was proposed in good faith, and thereby eligible for

1

confirmation pursuant to Bankruptcy Code[1] §1325(a)(3). This decision constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

The Plan provides for 36 monthly payments of $700 per month and anticipates a pro tanto distribution to unsecured creditors. Debtor will make ongoing monthly payments directly to the lienholders for the mortgage on his residence ($2,180), an undeveloped lot in Mexico ($205) and his vehicle ($426). In addition, the Debtor will transfer $23,500 from the attorney trust account to the Chapter 13 Trustee ("Trustee") for distribution within 30 days of confirmation first to the remaining Child Support Claim and then in satisfaction of the secured portion of Patricia's Claim. Further, Debtor will transfer to Patricia $40,000 of Debtor's interest in a 401(k) plan pursuant to a QDRO that will be prepared in his divorce proceeding. The 401(k) plan is not property of the estate. The court estimates that Patricia will receive through the Plan full payment on the Child Support Claim and a distribution of approximately 56% on the Claim.

Patricia asserts the Plan is not proposed in good faith on the basis that Debtor reduced his income in order to provide for lower payments, that Debtor's motivation in filing this case is to obtain a discharge of the Claim at a reduced amount, and that the primary debt to be discharged would be exempt in a chapter 7 case.

Analysis

In addition to other requirements, in order to be confirmed a chapter 13 plan must be proposed in good faith. Bankruptcy Code § 1325(a)(3). "Good faith" is not defined in the statute or legislative history. *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1389-90 (9th Cir. 1982). In application, courts have determined it requires a case-by-case analysis. While non-exclusive, eleven factors were recognized as guidelines for determining good faith in *Fidelity & Casualty Co v. Warren (In re Warren)*, 89 B.R. 87, 93 (9th Cir. BAP 1988). The application of each follows.

---

[1] 11 U.S.C. §§ 101, et seq., herein referred to as the "Bankruptcy Code."

2

1) <u>The amount of the proposed payments and the debtor's surplus and 2) The debtor's employment history, ability to earn, and likelihood of future increases in income</u>

These factors are discussed together as they address Patricia's primary allegation: that Debtor, who is self-employed, has reduced his income in order to lower his payment obligations under the Plan.

At trial, Debtor testified that in the past his income was significantly higher than it is currently. While he held various jobs, he was most successful as the owner, and a principal employee, of UCD, Inc. ("UCD"), a business that provided utility construction design and permit approval services. This business depended on new construction projects requiring their services. Economic changes in 2008 and 2009 resulted in significantly fewer construction projects, and the Debtor's business deteriorated to the point that UCD was sold in 2009 to Debtor's business partner for an assumption of liabilities.

Debtor then returned to school and obtained a certificate in solar energy design. Also during 2009, Debtor and Patricia separated and began dissolution proceedings.

Next, in July 2011, Debtor formed a new business, Energy Consulting Services, Inc. ("ECS"), providing solar energy and sustainability consulting services. In January 2012, ECS expanded its business to include related design work for gas and electric services by subcontracting this work to Debtor's former company, UCD. ECS is a closely-held corporation. Its stock is owned by Debtor, Debtor's mother, Patricia L. Feiling ("Mother"), and Debtor's adult son, Anthony Feiling ("Anthony"). Debtor is the principal employee of ECS. He performs all substantive client-based work of ECS that is not subcontracted to UCD. Mother provides administrative services to ECS including Quickbook accounting, banking, issuing invoices and answering related customer questions. During 2012, ECS also contracted with an independent consultant for assistance in setting up Quickbooks and creating spreadsheets. Anthony does not work for the company. The only benefit he receives from ECS is a company cell phone. He is allowed to use a company credit card for personnel expenses, for which he subsequently reimburses ECS.

3

Case: 11-71474   Doc# 114   Filed: 06/05/13   Entered: 06/06/13 16:50:10   Page 3 of 9

Since November 2011, Debtor has received monthly income of $3,500 from ECS.[2] Through Mother's testimony at trial, Patricia challenged the amount of Debtor's income from ECS on the basis that ECS's available assets were artificially decreased based on non-business expenditures and distributions to Mother. The following table summarizes the challenged financial disbursements of ECS in 2012:

| Amount | Description |
| --- | --- |
| $30,000 | Loan to Jack Bessolo four months prior to Bessolo's chapter 11 bankruptcy petition |
| $15,000 | Owner's distribution to Mother |
| $ 8,500 | 1099 income to Heather May for Quickbooks services similar to Mother's business responsibilities |
| $ 5,000 | Purchase of partial interest in duck club for marketing purposes |
| $ 2,500 | $500 per month increase in monthly income of Mother, beginning in August 2012 |
| $  429 | Family expenses paid through ECS (i.e. swim team, fitness club) |
| $61,429 | TOTAL |

The court finds that most of the challenged expenses were not for the benefit of the business, or were disbursed to Mother instead of Debtor in order to reduce Debtor's income. Specifically, the unsecured loan to Jack Bessolo, a family friend, four months prior to his personal bankruptcy filing did not benefit ECS and reduced its available assets for salaries. Additionally, Mother received a $15,000 distribution in addition to her salary in October 2012. She also received a salary increase of $500 per month beginning in August 2012. Mother asserted that funds were only available for one partner to take, and that she took them because she was the capital investor. However, her initial capital contribution was minimal. Further, Debtor's services are

---

[2] Originally, funds were distributions based on Debtor's ownership interest in ECS. Later, Debtor began receiving income as an employee. The gross amount of Debtor's monthly income remained $3,500.

4

necessary and integral to growth and performance of the business, whereas Mother's are for support. Finally, the swim team and health club payments did not benefit ECS and do not appear to be legitimate business expenses. The remaining challenged expenses can reasonably be interpreted as business expenses necessary to creation of books and records and initial marketing efforts. Based on the expenses challenged by Patricia, the court finds that an additional $47,929 in assets of ECS should be recalculated as assets that should have been available for distribution as income by ECS.

The testimony is not determinative on how the additional assets of $47,929 should be allocated between Debtor and Mother. Debtor appears to work full-time for ECS. No testimony was provided on whether Mother's work is full or part-time. Debtor initially invested $1,000 in the business, while Mother invested $4,000. Each worked for several months without compensation until the business generated income to pay salaries. Lacking further guidance, the court will assume that Debtor and Mother would have been entitled to share equally in these additional assets—had they been properly allocated. As a result of the reallocation, Debtor's income should have been $1,997 per month greater than was paid in 2012.

Applying this reallocation to Debtor's income, Debtor is assumed to have income of approximately $5,500 per month for living expenses and plan payments. This is exactly what Debtor's schedule I provides. While the source of funds is different--$3,500 income, plus $2,000 gift from parents each month—the available income remains the same.

The court finds that although Debtor has engaged in gamesmanship regarding his income allocation from ECS, when Debtor's potential employment income is recalculated, the available funds for distribution are consistent with those provided for in the Plan. Thus, while not a credit to Debtor's character, the financial considerations of the first and second factors are met.

3) <u>The probable or expected duration of the plan</u>

The Plan term is 36 months; the period of time required based on Debtor's current available income pursuant to Form B22C. Notably, if Debtor's income is assumed to be $5,500 per month, the amount discussed above as the recalculated income for Debtor, then Debtor's commitment period remains at 36 months. While creditors always have the potential for receiving a greater distribution over a longer

5

commitment period, the evidence presented does not suggest that Debtor is not acting in good faith by proposing a 36 month plan.

> 4) <u>The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court</u>

Debtor's ongoing expenses as provided in the schedule J were not challenged directly. Not all unsecured creditors listed in the schedules have filed proofs of claim, and the proof of claim amounts differ slightly. Only those unsecured claims for which a proof of claim is filed will be paid through the Plan. The court finds that there is no convincing testimony that Debtor manipulated claims in the case or sought to mislead the court in the schedules or statement of financial affairs.

> 5) <u>The extent of preferential treatment between classes of creditors</u>

Holders of claims that are similar in type will receive equal distributions through the Plan. In addition, Patricia will receive an additional $40,000 distribution from non-estate assets. Thus, to the extent there is disparate treatment, it is in favor of Patricia—the objecting party and holder of a claim that would be nondischargeable in Chapter 7.

> 6) <u>The extent to which secured claims are modified</u>

No secured claims are modified in the Plan. Debtor's intent to continue payments of $205 per months, or $7,380 over the Plan term, for an undeveloped lot in Mexico raises concerns for the court as there is no evidence that the claim is in fact secured. However, no objection to the secured status of the claim has been filed. Further, to the extent the claim is secured the Ninth Circuit recently held in *In re Walsh,* 711 F.3d 1120, 1133-35 (9th Cir. 2013), that a good faith challenge to payment of a non-essential secured debt is preempted by the statutory language.

> 7) <u>The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7</u>

Patricia's Claim is the largest unsecured claim in this case and it would be exempted from discharge in a Chapter 7. The Claim has been allowed as a general unsecured claim in the amount of $118,170. Pursuant to the terms of the Plan, Patricia will receive a prompt distribution of $18,100 from the Hesseltine Trust ($23,500 held in trust, less the $5,400 required to first satisfy the Child Support Claim). Through a QDRO in the

divorce proceeding, $40,000 of Debtor's interest in his 401(k) Plan with PG&E will also be distributed to Patricia on the Claim. Patricia will also receive distributions from monthly payments made in the Plan. The exact amount to be distributed to Patricia going forward is unknown. Based upon priority tax claims and potential administrative claims, the court estimates that Patricia may receive an additional $8,000 through the monthly distributions.[3] This is approximately $66,100, a 56% distribution on the claim.

Debtor asserts that the court should consider additional factors providing partial satisfaction of the Claim: payments made by Debtor on Patricia's family law attorneys' fees and Patricia's liquidation of a 401(k). Debtor paid approximately $10,000 to Patricia's family law attorney as ordered in the state court proceeding. These funds were paid approximately two months prior to the court's detailed decision after trial, and are not referenced therein as a credit towards the obligations due to Patricia. As such, the court will not apply them as such now.

Patricia liquidated a 401(k) in her name prior to a QDRO by the state court. The 401(k) contained approximately $52,000 prior to distribution and was asserted to have been liquidated to support ordinary living expenses. No information was provided as to how this 401(k) may have been allocated through the QDRO. If it would have been split evenly between Debtor and Patricia—an assumption that may underestimate Patricia's potential recovery based upon Debtor's greater income during the marriage—then Patricia received a substantial benefit from liquidation prior to a QDRO. This benefit significantly increases Patricia's potential recovery on the Claim to approximately 78%. With this additional recovery, the court finds that the otherwise non-dischargeable claim receives a sufficient recovery such that this factor does not prohibit a finding of good faith.[4]

8) <u>The existence of special circumstances such as inordinate medical expenses</u>

During the course of this case, Debtor's child support obligations were substantially increased. The increased obligation was paid by gift from Debtor's parents. Debtor is seeking a reduction of the child support

---

[3] This is an estimate of potential distributions for the court's analysis. It is not a finding or guaranty of funds to be distributed to Patricia based on Debtor's monthly payments into the Plan.

[4] This finding assumes that the $40,000 distribution from Debtor's 401(k) provided for in the Plan and that Patricia's liquidated 401(k) will not be applied to reduce the allocation to Patricia in the QDRO.

7

obligations in state court.  Based on the fluid nature of the child custody and support in this case, the court does not address this as a special circumstance here.

9) <u>The frequency with which the debtor has sought bankruptcy relief</u>

This is Debtor's first bankruptcy filing.

10) <u>The motivation and sincerity of the debtor in seeking Chapter 13 relief</u>

The court finds that Debtor's principal motivation in filing a Chapter 13 case was halting Patricia's pre-bankruptcy collection efforts on the Claim.  The pre-bankruptcy collection efforts included garnishment of bank accounts, and seizure of personal property and Debtor's vehicle.  As the Claim is not dischargeable in a Chapter 7 case, Chapter 13 is the only effective means of addressing this obligation and collection efforts.

11) <u>The burden which the plan's administration would place upon the trustee</u>

The Plan is not anticipated to impose an additional administrative burden on the trustee.

Based on the foregoing analysis of the *Warren* factors, the court finds that the Plain is proposed in good faith.  The remaining requirements for confirmation having been satisfied, the Plan may be confirmed.  While Debtor's income may be artificially reduced, the gift funds from Debtor's parents are equivalent to Debtor's properly calculated income.   Thus, there is no financial impact of the income reduction on the Plan payments.  The Plan also provides for a transfer of $40,000 from non-estate assets in partial satisfaction of the Claim.  Additional consideration of the 401(k) liquidation by Patricia prior to a QDRO indicates the Claim will be significantly satisfied.  The remaining factors indicate that the plan is proposed in good faith.  Accordingly, the Plan will be confirmed.

The Chapter 13 Trustee is requested to submit a form of order confirming the Plan, as set forth in this Decision.

**END OF DECISION**

COURT SERVICE LIST

Patricia F. Feiling
2575 Samuel Street
Pinole, CA 94564